**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 20 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

W. A. MONCRIEF, JR., as independent
executor and personal representative of the
ESTATE OF W. A. MONCRIEF, deceased;
W. A. MONCRIEF, JR., individually, as Trustee
for the LEE WILEY MONCRIEF TRUST, as
Trustee for the TOM O. MONCRIEF 1967
TRUST, and as Trustee for the WILLIAM
ALVIN MONCRIEF III TRUST; CHARLES B.
MONCRIEF, individually and as independent
executor and personal representative of the
ESTATE OF W. A. MONCRIEF, deceased;
RICHARD W. MONCRIEF, as independent
executor and personal representative of the
ESTATE OF W. A. MONCRIEF, deceased, and
as Trustee for the RWM 1988 Trust;
MICHAEL J. MONCRIEF, individually and as
Trustee for the MICHAEL J. MONCRIEF
GRANTOR'S TRUST; RICHARD BARTO
MONCRIEF, individually, and WADE W.
WILEY, JR., as Trustee for the RICHARD
BARTO MONCRIEF 1988 TRUST;

       Plaintiffs-Appellants/
       Cross-Appellees,

   v.

WILLISTON BASIN INTERSTATE PIPELINE
COMPANY; and MDU RESOURCES GROUP,
INC.,

       Defendants-Appellees/
       Cross-Appellants.

Nos. 97-8087
and 97-8088

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 93-CV-1045)**

---

William Pannill, Pannill, Moser & Barnes, L.L.P., Houston, Texas (Roy L. Barnes, Pannill, Moser & Barnes, L.L.P., Houston, Texas, and Craig Newman, Casper, Wyoming, with him on the briefs) for Appellants/Cross-Appellees.

Daniel S. Kuntz, Zuger, Kirmis & Smith, Bismarck, North Dakota (James S. Hill, Rebecca S. Thiem, Zuger, Kirmis & Smith, Bismarck, North Dakota, and Frank D. Neville, Casper, Wyoming, with him on the briefs) for Appellees/Cross-Appellants.

---

Before **PORFILIO** , **McWILLIAMS** , and **ANDERSON** , Circuit Judges.

---

**ANDERSON,** Circuit Judge.

---

This is a diversity action alleging breach of a 20-year contract (July 7, 1976 - July 6, 1996) for the purchase of natural gas under leases on properties located in Converse County, Wyoming. [1] The plaintiffs' complaint seeks, inter alia: (1) damages for alleged underpayment for delivered gas and for the

---

[1] The contract was entered into by W.A. Moncrief on his own behalf and that of his son, W.A. Moncrief, Jr. ("Tex"). W.A. Moncrief died in 1986. The plaintiffs in this action include Tex Moncrief, individually and as personal representative of his father's estate, as well as various trustees and others, all claiming under interests which originated with W.A. Moncrief under the contract. For expedience, we refer to the plaintiffs collectively, as such, and to W.A. and Tex Moncrief together or by individual names where necessary for clarity in context.

defendants' refusal to buy gas after November 1993; (2) a declaratory judgment that following deregulation of natural gas prices the contract continued to obligate the defendants to pay for gas at the highest rate prescribed or permitted by Congress during regulation; and (3) a declaratory judgment that in addition to "native" gas produced from the plaintiffs' wells, the defendants were required to take and pay for "makeup" gas—that is, gas purchased by the sellers from outside sources, injected into the field to maintain pressure for oil production, and then extracted from the field along with "native" gas and delivered to the defendants.

The district court held that the defendants breached and wrongfully repudiated the contract in 1993, that the plaintiffs are entitled to damages from August 13, 1993, through the end of the contract term on July 6, 1996, and that the defendants were obligated to purchase makeup and all other gas, up to the contract limit of twelve million cubic feet per day, delivered by the sellers from August 1993 to the end of the contract term. However, the district court rejected the plaintiffs' theory that the highest rates prescribed or permitted by Congress during periods of price regulation lived on after deregulation as the applicable contract price. Instead, the court determined sua sponte that the favored nations clause issue had been tried by implied consent, and held that the favored nations clause of the contract applied to set the contract price after August 1993. On its own motion, the court reopened the case for the introduction at a later date of

evidence of damages under the favored nations clause. Following the subsequent reopened trial, the court ruled that the contract price for gas from August 13, 1993, through July 6, 1996, was set by reference to prices charged under two contracts introduced into evidence by the plaintiffs after the first trial. Applying those prices to the types and quantities of gas covered by rulings described above, and after subtracting amounts the plaintiffs actually received, the court awarded the plaintiffs damages in the amount of $15,551,455.00, plus costs. The court declined to award prejudgment interest.

On appeal and cross-appeal, the parties, respectively, do not challenge the district court's rulings that the plaintiffs are not entitled to damages for any period prior to August 13, 1993, [2] and that the defendants wrongfully repudiated the contract in 1993, entitling the plaintiffs to damages for the remaining approximately two and a half years of the 20-year contract. All the other rulings are variously contested by one party or the other.

After full consideration of the record, and for the reasons stated below, we affirm the district court's rulings that the defendants breached and wrongfully

[2]The district court held that the plaintiffs are not entitled to recover any damages for the period from January 1, 1985, to August 13, 1993, for any one of four independent reasons: de facto price renegotiation; statute of limitations (to 1989); waiver and estoppel; and laches. Except for disputing the findings regarding de facto price redetermination, the plaintiffs do not contest these holdings in their briefs on appeal. Issues not argued in the opening brief on appeal are deemed waived. See Jordan v. Bowen, 808 F.2d 733, 736 (10th Cir. 1987).

repudiated the contract in 1993, and that the plaintiffs are entitled to damages from August 13, 1993, to July 7, 1996. We also affirm the district court's ruling that the last, highest prices under government regulation did not survive deregulation as applicable prices for gas under the contract. We reverse the district court's rulings that the favored nations clause of the contract applies and establishes damages, and that the defendants were obligated to purchase gas not attributable to lands committed to the contract by the plaintiffs, including "makeup gas." Accordingly, we vacate the judgment, and remand the case for a determination, on evidence in the record prior to the court's reopening order, of damages from August 13, 1993, to July 7, 1996. Furthermore, because the district court's conclusion that prejudgment interest was not warranted in this case was premised on its determination that plaintiffs' damages were to be computed by reference to the favored nations clause, a determination we hold to be improper, we vacate the district court's prejudgment interest determination and remand to the district court for a determination regarding whether prejudgment interest is warranted in light of our treatment of the case.

## BACKGROUND

The district court thoroughly laid out the facts of this case, and the course of government regulation of interstate and intrastate natural gas prices under the

Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301-3432 (1982) (§§ 3311-3348 repealed 1989), in its published opinion on the parties' cross-motions for summary judgment, Moncrief v. Williston Basin Interstate Pipeline Co., 880 F. Supp. 1495 (D. Wyo. 1995), and in its Findings of Fact and Conclusions of Law issued on August 16, 1996, 3 J.A. 1170. We restate, summarize and add to those opinions only those facts and references to the NGPA which are necessary to our decision.

W.A. Moncrief and Tex Moncrief were professional oil and gas businessmen, based in the Moncrief Building in Fort Worth, Texas, whose joint ventures in that business began in 1945 and eventually covered at least five states. In 1974, they joined with Woods Petroleum Co. ("Woods") to drill 12 wells in the Powder River Basin in eastern Wyoming. One of those wells discovered an oil field which was designated as the Powell II Unit. The field was a retrograde gas-condensate field, that is, oil and gas existed in a gaseous state in the reservoir. The land overlying the reservoir was owned by other parties, to whom the Moncriefs and the other working interest owners paid production royalties.

In 1976 the Moncriefs and Woods, which acted as the Moncriefs' agent, entered into a 20-year contract with the Montana-Dakota Utilities Company (later named MDU Resources, Inc.) (hereinafter "MDU") for the sale of natural gas produced from the Powell II Unit, with interests in specified sections in

Townships 39 and 40 North, in Converse County, Wyoming. Interests in additional lands in Converse County were added to the contract by amendment in 1978 and 1979. MDU later formed Williston Basin Interstate Pipeline Company (WBIPC) as a wholly-owned subsidiary, and assigned its gas contracts to it in 1985.[3]

## I. Price

The contract was entered into at a time of supply shortage and, therefore, in a seller's market. Also, since intrastate sales of gas were unregulated at the time, Woods and Moncrief favored contracting with MDU since the sales could be for the intrastate Wyoming market and could command a higher price than was available for interstate sales.

The pricing provisions of the contract reflect these circumstances. The contract provided what, for ease of reference, can be called a base price (¶¶ 7.1 and 7.2); two price escalator provisions—a regulated "area rate" clause (¶ 7.4) and a "favored nations" clause (¶ 7.6); and a clause providing for the renegotiation, at the seller's option, of prices once government regulation of interstate gas prices ceased (¶ 7.5). Those provisions, in relevant part, are as follows:

---

[3]Both are joined as defendants and are referred to jointly unless context requires individual references.

## ARTICLE VII
## Price

Buyer shall pay Seller for the gas delivered hereunder in accordance with the following schedule:

7.1     For the period commencing on the date of initial delivery of gas hereunder, until January 1, 1978, a price of $1 per million Btu.

7.2     The price shall be increased 1.5¢ per million Btu on January 1, 1978 and on each subsequent January 1 during the term hereof.

. . . .

7.4     If the Federal Power Commission, or any successor or other governmental authority having jurisdiction in the premises, shall at any time hereafter prescribe or permit, for the pricing area in which the properties are located, a higher just and reasonable area rate including all adjustments for the same type of gas as committed hereunder than the price herein provided to be paid, then the price hereunder shall be increased, effective as of the date such higher price is prescribed, to equal such higher rate.

7.5     In the event the regulation of the price at which natural gas is sold in interstate commerce ceases, then Seller shall have the right to request a redetermination of the prices at which natural gas is to be sold hereunder.  Buyer shall notify Seller of the date of deregulation in writing and any request for redetermination shall be made to Buyer in writing and shall in the first instance be made during the six (6) month period immediately following the effective date of such deregulation, and subsequently during the six (6) month period immediately preceding each anniversary of the effective date of such deregulation.  Buyer shall notify Seller thirty (30) days prior to each anniversary date of deregulation so that Seller may request redetermination.  If Seller shall make any such request, representatives of Buyer and Seller shall promptly meet and attempt to determine the fair value of gas deliverable hereunder for the then remaining term of this Agreement commencing in the first instance on the date such request is made and subsequently on each

anniversary of the effective date of such deregulation, but in no event shall the value so determined or to be determined pursuant to the further provisions of this paragraph result in a price which is less than the price otherwise applicable hereunder. . . .

7.6     In the event a bonifide [sic] utility company or other pipeline company enters into a gas purchase contract with any Seller for the purchase of gas of similar quality and quantity from lands located East of the Continental Divide in the State of Wyoming, whose terms call for a higher price to be paid from time to time than the then effective price contained herein, the prices herein contained shall be adjusted to reflect such higher prices on the date of first delivery of gas and from time to time thereafter, under the referenced contract.

8 J.A. 3538-40.

Moncrief was never paid the base price. A short while after the contract was signed, the Federal Power Commission (FPC) increased its national rate for new interstate gas to $1.42 per million British thermal units (MMBtu), and MDU paid that rate when deliveries began. Two years later, Congress enacted the NGPA, which extended federal regulation to the intrastate natural gas market for the first time. In so doing, the NGPA divided the intrastate gas market into several categories, and made a distinction between gas brought into production after the statute's passage, which was governed by § 102 of the new statute, and gas produced pursuant to an intrastate gas contract in existence in 1978, governed by § 105. Section 105 set a ceiling price for gas delivered under existing contracts, providing that the maximum lawful price for such gas was the regulated price set for new gas under § 102. After Woods insisted that it and Moncrief

were entitled, under the contract, to an amount equal to the § 102 rate for new gas, MDU began paying the § 102 rate in October 1979 and continued doing so until January 1985, when most of the NGPA price regulations expired.     See 15 U.S.C. § 3331(a) (1982) (repealed 1989).  The § 102 rate in December 1984 was $3.845 per MMBtu, and MDU was paying that amount to Moncrief.

The district court found most of the following facts.  Anticipating deregulation, in June 1984 MDU sent a letter to its natural gas sellers, including Moncrief, proposing a price of $2.25 per MMBtu for deregulated gas effective January 1, 1985.  Representatives of MDU and WBIPC later met with the sellers, and during those meetings WBIPC offered to pay $2.25 per MMBtu, inclusive of production tax reimbursement, for deregulated gas.  WBIPC also offered an additional 50¢ per MMBtu for natural gas produced during 1985 if the seller agreed to execute a contract amendment releasing MDU/WBIPC from any past claims under the contract and providing greater flexibility to WBIPC under the contract.  Ronald Tipton of WBIPC met with the Moncriefs on August 8, 1984, and February 28, 1985, to discuss these proposals with respect to the contracts WBIPC had with W.A. Moncrief and Tex Moncrief.  The Moncriefs did not agree to amend their contract but stated that they would not sue WBIPC.  Starting in January 1985, the pipeline paid Woods $2.25 per MMBtu for Moncrief's interest

in the gas purchased under the contract, and continued to pay that price during 1985 and 1986.

On October 3, 1986, WBIPC sent a letter to Moncrief stating its intention to reduce the price that it was paying for natural gas effective January 1, 1987. On March 16, 1987, WBIPC sent another letter to Moncrief setting forth WBIPC's proposal to pay $1.75 per MMBtu and requesting that Moncrief sign a proposed contract amendment that would offer WBIPC greater flexibility under the contract. WBIPC representatives Ronald Tipton and Dennis Haider met with Tex Moncrief on April 28, 1987, to discuss WBIPC's proposal to pay $1.75 per MMBtu. At this meeting, Tex would not agree to the proposed contract amendment.

During the 1984, 1985, and 1987 meetings with MDU and WBIPC representatives, neither W.A. Moncrief nor Tex Moncrief asserted that the contract price remained at the last regulated price prior to deregulation of natural gas prices. During these meetings, neither W.A. Moncrief nor Tex Moncrief stated that the price of the gas was a regulated price under NGPA § 105(b)(3).

WBIPC paid Woods or its successors $1.75 per MMBtu for Moncrief's gas produced from January 1, 1987, through October 31, 1993. WBIPC provided monthly statements to Woods and its successors which showed the prices paid for the gas. Woods and its successors provided monthly settlement statements to

Moncrief which showed or allowed Moncrief to determine the price WBIPC was paying for the gas. Moncrief had employees who reviewed the statements received from the operator and who were specifically charged with the responsibility to determine that the prices received for gas sales were correct under the applicable contracts. In addition, internal summaries of the operator reports and prices paid were prepared by Moncrief's employees. These reports were discussed with and readily available to Tex Moncrief. These payments were accepted by Woods (or its successors) and Moncrief without reservation or objection made to WBIPC as to the price paid. WBIPC relied upon Moncrief's acceptance of these prices paid by it from 1985 to 1993.

From 1985 to August 1993, the Moncriefs made no claim that any provision of their contract with MDU mandated prices higher than the $2.25/$1.75 per MMBtu paid by WBIPC, and WBIPC made no assertion that the price should be the lower contract base price.

On August 9, 1993, Tex Moncrief sent a letter to WBIPC stating for the first time his position that the contract price in effect was the December 1984 NGPA § 102 price of $3.845 per MMBtu plus tax reimbursement. He sent a similar letter on August 12, 1993. Neither Moncrief nor WBIPC construed these letters as a request for price redetermination under ¶ 7.5 of the contract.

On November 11, 1993, Moncrief sent a letter to WBIPC stating that the contract price after January 1, 1985 was established under ¶ 7.6, the favored nations clause. Plaintiffs later abandoned that position in litigation and, in their Second Amended Complaint, they asserted, as alternative arguments, that the contract price of the gas was either the regulated § 102 price in December 1984 ($3.845), or the § 105(b)(3) ceiling price in December 1992 ($6.371).

WBIPC, in turn, asserted that in and after 1985 the contract price was in actuality the base price which, with annual increases under ¶ 7.2, amounted to $1.23 per MMBtu in 1993. It also informed Moncrief that effective November 1, 1993, it would no longer purchase gas under its existing contracts. This eventually resulted in the wrongful repudiation ruling by the district court which WBIPC does not appeal.

## II.    Quantity

The district court also found the following facts regarding the issue of "makeup" gas. In the late 1970s, MDU became aware of the Powell II Unit owners' plans to repressure the gas reservoir by reinjecting gas produced from the unit and from other sources. The reinjection plan called for a 14-year period of recycling and six to seven years of "blowdown" (production of the injected gas).

The parties believed that reinjection would add to the oil and gas reserves ultimately recoverable from the reservoir. MDU urged the unit owners to buy natural gas for recycling rather than nitrogen, even though natural gas cost more, because the nitrogen would have presented a processing problem upon extraction. After balancing the costs and benefits of purchasing nitrogen, the unit decided to purchase outside gas for injection.

On September 1, 1983, the Powell II Unit and the adjoining Spearhead Ranch Unit were terminated with the approval of the Bureau of Land Management. The lands from the Powell II and Spearhead Ranch Units were combined with other lands from the surrounding area to form the Powell Pressure Maintenance Unit (PPMU).

At the same time, the PPMU owners started a repressurization program for secondary recovery of oil and natural gas liquids from the unit. Natural gas produced from the unit was processed to remove the liquid hydrocarbons and then injected or "recycled" back into the unit to maintain the reservoir pressure. As planned, the unit owners purchased makeup gas from outside the unit, which was injected into the reservoir to assist in maintaining the desired pressure level. Over 17.5 billion cubic feet of makeup gas was injected into the unit between September 1, 1983, and December 1, 1993. Moncrief and the other PPMU owners

did not pay severance or production taxes or royalties on the makeup gas withdrawn from the unit.

In 1993, the PPMU owners elected to discontinue repressurization and begin blowdown of the unit. During blowdown, the operator stops injecting gas and allows the pressure to decline as gas is withdrawn from the unit. The operator of the Powell II Unit informed WBIPC of its plans for blowdown of the reservoir as early as 1991, but the pipeline did not assert that it was not obligated to take the gas injected from outside the unit until it answered in this lawsuit. WBIPC believed that the Powell II contract remained in effect and feared litigation if purchases ceased.

Beginning in 1993, Moncrief tendered blowdown gas of six million cubic feet per day to WBIPC. WBIPC offered to cancel the contract based on the representation that the pipeline's customers (including its parent) had discontinued purchases under Federal Energy Regulatory Commission (FERC) Order No. 636. WBIPC also claimed that the pipeline's take obligation was to take only Moncrief's working-interest share of twelve million cubic feet per day. Moncrief disputed all these claims and demanded adequate assurances, which WBIPC refused to provide. WBIPC has refused to purchase gas from Moncrief since November 1, 1993.

**DISCUSSION**

**I.    Price**

      **A.    Did the District Court Properly Address the Merits of the Favored Nations Clause Claim?**

This action was commenced on November 9, 1993. Following extensive pretrial proceedings, the case was tried in a bench trial from January 10-19, 1996. In its opinion, issued on August 16, 1996, the district court ruled sua sponte that Moncrief was entitled to damages under ¶ 7.6 of the contract, the favored nations clause, despite the fact that Moncrief did not present this theory in his Second Amended Complaint. The court reopened the case to receive "evidence that the parties may wish to present on this issue," because the record did not contain any evidence which would permit the calculation of damages (if any) under the clause. 3 J.A. 1196. In these rulings the court did not invoke Fed. R. Civ. P. 15(b) nor did it conduct any analysis justifying the application of that rule. Rather, it explained the absence of evidence, and the basis for reopening the case, on the ground (unsupported by any reference to the record) that "the parties thought that the favored nations clause evidence had been excluded, inadvertently, by the Court in its summary judgment opinion." 3 J.A. 1196.

After allowing additional discovery, the court subsequently held further trial proceedings on April 27, 1997. In an opinion issued on June 26, 1997, it denied the defendants' motion for reconsideration, and concluded that the

plaintiffs' complaint should be amended to conform to the evidence pursuant to Fed. R. Civ. P. 15(b), so as to include a claim under the favored nations clause of the contract. The court determined that the issue was tried by implied consent of the parties, and that the defendants were not prejudiced since they had been given ample post-trial discovery and preparation time, and there was an evidentiary hearing on the merits.

The district court then ruled that a contract between Forest Oil Corporation and KN Energy, Inc. (the "Forest Contract") for the purchase of gas at $4.38 per MMBtu qualified under ¶ 7.6, and established the Forest Contract price as the Moncrief contract price for the period from August 13, 1993, through September 30, 1993, when the Forest Contract was assigned to a subsidiary. It also ruled that a contract between Moncrief and ANR Pipeline Company, originating in 1980 and amended in 1989, for the purchase of gas at $3.50 per MMBtu, qualified under ¶ 7.6 and established the Moncrief contract price for the period from October 1, 1993, to July 7, 1996.

On appeal, the defendants first argue that this issue is substantive, not procedural, and is governed by Wyoming law relating to the waiver, abandonment and release of claims. We disagree. The record relates most directly to the procedural posture of the case. Therefore we analyze this issue under the Federal Rules.

Rule 15(b) provides in relevant part as follows:

> **(b) Amendments to Conform to the Evidence.**
> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

We review a district court's decision to amend the pleadings to conform to the evidence under the abuse of discretion standard. See Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995). Here, whether the district court abused its discretion by sua sponte introducing the favored nations clause claim and allowing further trial proceedings is best evaluated in the context of how the plaintiffs themselves proceeded as to that claim.

In its 1995 summary judgment opinion the District Court specifically noted the changes in the plaintiffs' claims, including the abandonment of any claim under the favored nations clause of the contract:

> Plaintiff's theories of recovery have been evolving. Moncrief's three different complaints in this action have reflected three different theories of recovery. Moncrief's initial complaint argued that the sellers owed a higher price based on the Section 7.6 "favored nation" clause of the contract. In this initial complaint, Moncrief also asserted that the natural gas sold under the contract was deregulated on January 1, 1985, and that, based on the terms of the contract, the applicable price was the last regulated price of $3.845 per MMBtu plus tax reimbursement.

> In the plaintiff's First Amended Complaint he abandoned the
> application of the favored nations clause and concentrated on the last
> regulated price and his claim that the contract did not allow the
> contract price to decrease. In the First Amended Complaint, Tex
> Moncrief argued that deregulation of the contract price had occurred
> on January 1, 1985.
>
> Finally, the plaintiff's Second Amended Complaint, currently
> before the Court, proposes that the gas under the contract remained
> regulated after all. Moncrief now argues that the governing price
> comes from the Natural Gas Policy Act § 105(b)(3) which sets a
> ceiling price for "old gas." According to this contention, the
> applicable price under the contract is set by 18 C.F.R. 271.101.

Moncrief v. Williston Basin Interstate Pipeline Co., 880 F. Supp. 1495, 1504 (D. Wyo. 1995) (emphasis added). This is an accurate description of the evolution of the plaintiffs' claims, culminating with the Second Amended Complaint which then governed the proceedings. That complaint raises only the issue of, and seeks relief based on, regulated prices.

The plaintiffs' abandonment of a favored nations claim followed the defendants' discovery requests relating to that claim after the initial complaint was filed. Plaintiffs' counsel responded to those requests by telling defendants' counsel that plaintiffs would drop their claim on that clause. Plaintiffs' counsel then responded in writing to the discovery requests, stating that "Moncrief has chosen not to pursue his claim under the contract's 'favored nations' clause." 11 J.A. 4981-83. The plaintiffs then filed a motion for leave to amend their complaint, stating that "Moncrief has also amended his complaint to omit his

-19-

claim under the contract's 'favored nations' clause. . . ." 1 J.A. 37. The motion to amend was granted by the magistrate judge, and the favored nations clause claim was absent from the first amended complaint as well as the second amended complaint.

The absence of any favored nations clause claim by the plaintiffs is consistent in the plaintiffs' pretrial memoranda, trial brief, and pretrial proposed findings of fact and conclusions of law, all of which pursued regulated price claims. The court's pretrial conference order does not include any claim under the favored nations clause, and explicitly provided that the order controls and would not be amended except with consent of the parties unless "by order of the court to prevent manifest injustice." 3 J.A. 1014. In his lengthy opening statement, plaintiffs' counsel reconfirmed abandonment, stating that Moncrief initially made a claim under the favored nations clause "which we later withdr[ew]. We later abandoned that claim." 5 J.A. 2049.

It is undisputed that plaintiffs' counsel made no motion during trial, or at any time after trial, to amend its pleadings to reassert a claim under the favored nations clause of the contract. And, there was certainly no explicit consent by defense counsel that the issue could be reintroduced. As for the court's reference to an alleged view by the parties that there was an inadvertency or some confusion in the ruling on summary judgment, no motion for reconsideration or clarification

on the subject was filed by the plaintiffs after the ruling, at any time prior to trial (including contentions in pretrial orders), or after trial. In short, the court's ground for reopening the trial—inadvertency or confusion regarding the district court's summary judgment ruling—has never been reasserted again, including in the arguments on appeal.

The district court held that the issue was tried by implied consent because defense counsel referred to the favored nations clause when examining some witnesses about the contract, and introduced exhibits D-61, D-63, D-64, D-119, D-119-A, and D-121 which pertained to that clause. On appeal, plaintiffs' counsel identifies some of those and other exhibits as well, including D-108, D-113, and D–118, along with sixteen references to portions of the trial testimony. In sum, out of literally hundreds of exhibits, the district court and the plaintiffs have identified about twelve which even mentioned favored nations issues, and a handful of instances where that subject came up during the examination of witnesses.

We have reviewed all of these references to the favored nations clause. Whether viewed individually or collectively, they do not represent anything that can fairly be characterized as the introduction and trial of a favored nations price claim. See Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 457 (10th Cir. 1982) (stating that "[i]mplied consent is found where the parties recognized that

the issue entered the case at trial and acquiesced in the introduction of evidence on that issue without objection" ).

Some of these references are innocuous. [4] Some are inextricably intertwined with historical facts explaining the course of the parties' dealings, views, and conduct, both in-house and otherwise, and are entirely appropriate as part of describing the whole picture. [5] An omitted claim does not require redaction of history.

The balance of the material in question was obviously employed to discredit the plaintiffs' arguments that the Moncriefs and their employees and experts always regarded the contract price to be the last regulated price, that regulated prices continued after 1984, and that prices were never supposed to

---

[4]For instance, Exhibits D-108 and D-113, cited by the plaintiffs as favored nations exhibits, appear to have, at most, only a tangential connection to the favored nations clause. Exhibit D-108 contains only the barest reference to the existence of a favored nations clause in the contract, 10 J.A. 4515, and Exhibit D-113 contains no mention at all of the clause, 10 J.A. 4518.

[5]For instance, Exhibits P-5, P-8, and P-9, introduced by the plaintiffs, are documents dealing with the history of the negotiation of the contract, and which contain some mention of the existence of a favored nations clause and the reasons for its inclusion in the contract. 8 J.A. 3516, 3523, 3525. These documents also contain information regarding other contractual clauses, such as the area rate clause and the price redetermination clause. Similarly, Exhibit D-118 contains a reference to plaintiffs' desire in 1993 to find comparison contracts that would qualify under the favored nations clause, 10 J.A. 4525, but this document tells the reader no more than that plaintiffs were considering a favored nations argument, information readily available from plaintiffs' original Complaint, 1 J.A. 5-6.

decrease. [6] Implied consent cannot be based upon the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue. See Southwestern Stationery and Bank Supply, Inc. v. Harris Corp., 624 F.2d 168, 171 (10th Cir. 1980); Ellis v. Arkansas Louisiana Gas Co., 609 F.2d 436, 440 (10th Cir. 1979); see also 6A Charles Alan Wright et al., Federal Practice and Procedure § 1493, at 32-35 (2d ed. 1990). Indeed, "[w]hen evidence claimed to show trial of an issue by consent pursuant to Rule 15(b) is relevant to a separate issue already in the case, it would be unjust to the opposing party to consider a new theory of recovery after trial is complete." Cook v. City of Price, Carbon County, Utah, 566 F.2d 699, 702 (10th Cir. 1977).

Admittedly, the defendants' attempts to show that the prices they paid through 1984 reflected favored nations considerations rather than regulation as such, and that the plaintiffs ignored fluctuations in favored nations prices through 1992, are somewhat problematic. See Exs. D-61, D-63, D-64, D-119, D-119-A; see also 5 J.A. 2096-2100; 6 J.A. 2700-01. Both arguments necessarily subsume

---

[6]Exhibits D-61, D-63, and D-64 were introduced to point out that the favored nations clause, rather than the area rate clause, set the contract price between 1978 and 1985. 10 J.A. 4288, 4292, 4295. Exhibits D-119 and D-119-A were introduced to refute the plaintiffs' argument that the contract price could never decrease, by showing that the plaintiffs themselves, at one point, demanded that the pipeline pay a contract price, set by the favored nations clause, that fluctuated up and down over a period of years. 10 J.A. 4526-55.

the unspoken but inevitable premise that favored nations prices were and continued to be relevant. But, even an acknowledgment that ¶ 7.6 continued to be a viable part of the contract (apparently a given) does not resolve anything. It simply provides, arguendo, the basis for a claim to be proved, not proof of the claim.

If the claim asserted to have been tried by consent is that the applicable contract price from August 1993 to July 7, 1996, was set by a contract or contracts qualifying under ¶ 7.6, it faces an insurmountable obstacle. There is no evidence proving the claim. This deficiency is highlighted by the fact that the only competent evidence available to prove up the claim, and which was used by the court—qualifying comparison contracts and testimony and evidence concerning the qualifying contracts—was not introduced until the second trial, after the first trial was completed. Thus, even assuming hypothetically that the plaintiffs' first complaint was reinstated at trial, the favored nations claim would have failed for lack of proof of a qualifying contract and damages, each a sine qua non of the claim. After both parties rested, at the trial held in January 1996, the district court would not have been able to fashion a judgment for the plaintiffs under ¶ 7.6. And, sua sponte reopening the case for a further trial to breathe life into a failed issue is not the purpose of or sanctioned by Fed. R. Civ. P. 15. That

rule allows the pleadings to be amended to conform to the evidence already

entertained by the court, not to evidence presented at a further trial. [7]

---

[7]The second part of Rule 15(b), which allows amendment of the pleadings even where there is no implied consent to try a new issue, is not applicable to the facts of this case. That part of the Rule states that

> [i]f evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

Fed. R. Civ. P. 15(b).

There are two prerequisites to the invocation of this portion of the Rule, neither of which are satisfied here. First, the opposing party must object, at trial, to the admission of evidence on the ground that it is not within the issues raised by the pleadings. No such objection was ever lodged here—the only objection of any kind to Rule 15(b) amendment was WBIPC's counsel's protestations at closing argument of the January 1996 trial that the favored nations issue was not tried by consent. WBIPC never objected to the admission of any favored nations evidence, some of which it actually introduced, because the evidence relating to the favored nations issue introduced at trial was either innocuous or relevant to some other issue in the case.

Second, after the objecting party has satisfied the first prerequisite by objecting to the new evidence, the party seeking amendment of the pleadings must move, under Rule 15(b), for such amendment. A court may not sua sponte invoke the second portion of Rule 15(b). We have stated that "Rule 15(b) makes no provision for automatic amendment when . . . proper objections are made to the admission of evidence." Dunn v. Ewell (In re Santa Fe Downs, Inc.), 611 F.2d 815, 817 (10th Cir. 1980); see also 3 James Wm. Moore et al., Moore's Federal Practice § 15.18[3], at 15-77 (1998) (stating that "a court may not amend without a formal motion if the opposing party has objected to the evidence on the grounds that it is outside the scope of the pleadings").

For these reasons we conclude that the district court abused its discretion by holding that a claim under the favored nations clause, ¶ 7.6, was tried by implied consent, and by sua sponte reopening the case for a further trial on that subject, resulting in an award of damages.

**B.      Did Regulated NGPA Prices Continue to Operate as the Applicable Contract Price After Deregulation?**

Throughout this case, the plaintiffs' central argument as to rates has been that the contract price continued to be the last and highest NGPA regulated rate cognizable under ¶ 7.4 of the contract. They assert that the district court erred in its rulings that the contract is unambiguous, that intrastate natural gas prices were deregulated on January 1, 1985, and that NGPA rates did not survive deregulation as the continuing price under the contract. The district court's holding that the contract is unambiguous foreclosed consideration of parol evidence of the parties' intent as to the meaning of the contract provisions in question. [8] Nevertheless, although the district court stated that it did not consider such evidence in arriving at its decision, the court did receive parol evidence allegedly relevant to the parties' intent as to the meaning of the contract, as well as the parties' course of conduct, and that evidence is contained in the appellate record.

---

[8]The district court made no finding as to whether the contract was fully integrated, a separate ground for barring parol evidence.

We review de novo questions of contract ambiguity and legal interpretation, the meaning and effect of the NGPA, and Wyoming law. See Salve Regina College v. Russell , 499 U.S. 225, 239 (1991) (stating that "courts of appeals review the state-law determinations of district courts de novo "); United States v. Fillman , 162 F.3d 1055, 1056 (10th Cir. 1998) (stating that "[w]e review de novo the district court's interpretation of a federal statute"); City of Wichita v. Southwestern Bell Tel. Co. , 24 F.3d 1282, 1287 (10th Cir. 1994) (stating that "[t]he determination of the ambiguity of a contract is a question of law reviewed de novo"). We review the district court's findings of fact under the clearly erroneous standard. See Fed. R. Civ. P. 52(a); Candelaria v. EG & G Energy Measurements, Inc. , 33 F.3d 1259, 1261 (10th Cir. 1994).

There is a highly contested issue in this case as to whether the government's regulation of intrastate gas prices under the NGPA was discontinued by Congress as of January 1, 1985, or as of January 1, 1993. But there is no claim that any NGPA regulation of prices cognizable under the contract existed after 1992. [9] Since the only period at issue in this appeal is August 1993 through July 6, 1996, the contract's expiration date, it is largely

---

[9]See 15 U.S.C. § 3373(a). Plaintiffs have acknowledged in papers filed with both this court and the district court that "regulation continued until the end of 1992," Br. for the Appellants at 23, and that "Congress deregulated all gas sales on January 1, 1993," Moncrief's Supp. Memorandum in Support of Summary Judgment, 2 J.A. 539. See Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 1989 U.S.C.C.A.N. (103 Stat.) 157.

immaterial whether deregulation was effective on January 1, 1985, or January 1, 1993, unless the contract requires that regulated prices must continue as the contract price after deregulation. If, pursuant to this contract, regulated rates survived deregulation, then the date of deregulation becomes important because the regulated § 102 rate at the end of 1984 was $3.845 per MMBtu and the § 105(b)(3) ceiling rate at the end of 1992 was $6.371 per MMBtu. If relevant regulated rates did not survive deregulation under this contract, then we need not address whether deregulation ceased at the end of 1984 or 1992. Accordingly, the threshold question is whether regulated rates survived deregulation as the contract price for natural gas under the terms of the parties' contract. Our inquiry must, of course, begin with the terms of the contract.

## 1.

As indicated above, the district court found no ambiguity in the pricing provisions of the contract and held that regulated prices did not survive deregulation. It stated:

> Plaintiffs have urged that the contract did not provide for a fall in the contract price following deregulation, and, as a result, that the contract price remains at the highest regulated price. However, even if a gas contract does not explicitly provide for a lowering of a contract price, it is implicit in a price redetermination clause like that found in Section 7.5. See, Prenalta Corp. v. Colorado Interstate Gas, No. C89-1010-B (Brimmer, C.J.), rev'd on other grounds, 944 F.2d 677 (10th Cir. 1991); Questar Pipeline Co. v. Grynburg, et al., No.

92-CV-265-J (Johnson, C.J.) and PG & E Resources Co. v. Questar Pipeline Co. , No. 93-CV-063-J (Johnson, C.J.). Moreover, courts have also held that in gas purchase contracts, the escalated base contract price governs when deregulation occurs and the parties have failed to redetermine a new contract price. E.g., Colorado Interstate Gas v. Martin Exploration Management Corp. , No. 85-CV-0399 (Dist. Ct. El Paso County, Colo. Dec. 15, 1988).

Moncrief , 880 F. Supp. at 1520.

Alternately arguing for interpretations in their favor based on lack of ambiguity, Br. for the Appellants at 25-30, or ambiguity, Appellants' Reply Br. at 29, the plaintiffs offer a multitude of reasons why the district court erred in holding that regulated prices expired for contract purposes when they expired by statute. Their central thesis is that prices under this contract operated on an upward ratchet principle—they could only go up, never down. This position, they argue, is supported by the facts that the contract was made in a sellers' market and "[o]ne principal purpose of the contract was to assure Moncrief of the highest price he could collect for intrastate gas during the life of the contract." D. Ct. Findings of Fact and Conclusions of Law, 3 J.A. 1186. They point to the unambiguous language of the escalator clauses, which refer only to price increases and upward adjustments to reflect "such higher prices" or "such higher rate." 8 J.A. 3538, 3540 (¶¶ 7.4, 7.6). There are no provisions for lowering prices, and no market-out clause. In addition, plaintiffs assert that the contract

-29-

was all the work of the defendants and should therefore be construed against them.

The upshot of these arguments is that regulated rates purportedly served merely as a reference point or benchmark. Once that benchmark was established it took on (or always had) a life of its own as the contract price, unaffected by any later deregulation of the rate. As support for this benchmark principle, plaintiffs cite Amoco Prod. Co. v. Stauffer Chem. Co., 612 P.2d 463 (Wyo. 1980), and this court's opinion in Northwest Cent. Pipeline Corp. v. JER Partnership, 943 F.2d 1219 (10th Cir. 1991). Other than these two cases, the plaintiffs cite no authority purporting to directly support their position. To the contrary, they recognize that the district court cases cited by the court here are directly against them and they ask us to "overrule" those cases. Appellants' Reply Br. at 47. They also attempt to distinguish the district court cases on the ground that they were interpreting regulated interstate contracts "which had to accept federal pricing law." Id.

The plaintiffs' reliance on JER underscores the point that contract cases turn on the particular facts of each case.[10] Except for the first month, the contract

_____

[10]Similarly, Stauffer is readily distinguishable on its facts, and in any event provides no support for plaintiffs' benchmark argument. The issue in Stauffer was whether the parties intended to incorporate FPC vintaging concepts into the price terms of their contract. See generally Stauffer, 612 P.2d at 463-68. Neither party in that case argued that the contract price constituted a benchmark that could never subsequently decrease, and therefore the Wyoming Supreme Court in Stauffer simply never addressed that argument. We fail to see how Stauffer provides any support for plaintiffs' benchmark argument. Additionally, the natural gas contract at issue in Stauffer was fundamentally different from the

(continued...)

-30-

involved in the JER case had, essentially, only two ways to determine price: a regulated rate or, if regulation ceased, then, at the seller's option, a redetermined price under a specified formula. The district court in JER held that the contract was ambiguous as to price upon deregulation, because if regulation ceased, and the seller did not request a redetermination, there was no provision for a price. The court therefore resorted to extrinsic evidence to determine the intention of the parties. We upheld that decision, reasoning—on our way to deciding the case on extrinsic evidence grounds—that ambiguity exists where two rational but mutually exclusive choices are available. In this context we stated that

> [a] perfectly reasonable interpretation of this language (which the
> district court ultimately adopted) is that nothing happens to the
> contract price upon deregulation unless the seller requests
> redetermination. Otherwise the seller's redetermination right would
> be rendered meaningless.

JER Partnership, 943 F.2d at 1227.

Unlike the contract in JER, the contract in this case does not present an unavoidable conundrum in the event of deregulation and the seller's lack of request for a price redetermination. Both the base price provisions of ¶¶ 7.1 and

---

[10](...continued)
contract at issue in this case. The Stauffer contract contained base price provisions and an area rate clause, but, unlike the contract at issue in this case, it contained no favored nations clause. The court in that case interpreted the area rate clause as a form of a favored nations clause, but did so only in light of a "manifested [intention] to apply [the area rate clause] in the manner usual to a favored nations clause," and in light of the contractual absence of an actual favored nations clause. Id. at 468.

-31-

7.2 and the favored nations pricing provision of ¶ 7.6 continue to operate independently of deregulation and the operation of ¶ 7.4. And the contract does not state that the price must always stay at the highest regulated rate or other benchmark, nor does it say that regulated rates survive deregulation. These are merely argumentative inferences the sellers would have us draw.

On the other hand, the contract does not state that upon deregulation prices must revert to those set under ¶¶ 7.1, 7.2 or 7.6 if the seller fails to request price redetermination. So there is some basis for the plaintiffs' interpretation.

Nevertheless, the rationales here are not equally plausible, as they were in JER where the provisions created a virtual impasse. Under the favored nations clause here, the price would adjust favorably to the highest qualifying prices (applying the plaintiffs' own definition of "Seller" as any seller), thus satisfying the Moncriefs' desire to get the highest applicable price being paid in the described geographic area. And, if prices fell (plaintiffs assert that in 1975-76 prices were 67¢ per Mcf for interstate gas, and slightly above $1.00 per Mcf for intrastate free market gas, Br. for Appellants at 6), the escalated base price would protect them.

Accordingly, fully taking into account the context in which this contract was negotiated, we agree with the district court that the contract can be interpreted within its four corners without ambiguity, and that regulated prices

ceased to apply upon deregulation.  However, deciding that the contract is ambiguous would not change the outcome, as we next discuss.

**2.**

The plaintiffs alternatively argue that the contract is ambiguous and that the district court erred in failing to consider extrinsic evidence, inferring that we should remand for a new trial on the question of regulated pricing under the contract.  Here too, they cite JER, asserting that the case, in addition to declaring as a matter of law that regulated prices survive deregulation, also stands for the proposition that contractual ambiguity requires resort to extrinsic evidence, which they assert to be in their favor.

The district court in JER, unlike the district court in this case, declared the contract to be ambiguous.  It therefore admitted and considered extrinsic evidence on the meaning of the contract according to the parties.  As to that evidence we stated:

> The district court found that, in the absence of a seller request for redetermination, the parties intended the last regulated price to be the contract price upon deregulation.  Overwhelming evidence supported this conclusion.  Indeed, Williams's witnesses uniformly agreed that this was the parties' intention.  We cannot say that this finding was clearly erroneous.
>
> . . . .

-33-

> [T]he parol evidence was crystal clear: the parties intended the last regulated price to be the deregulated price unless the seller requested price redetermination.

JER Partnership, 943 F.2d at 1228-29 (citation and footnote omitted) (emphasis added).

That is not the situation in this case. The district court admitted extensive extrinsic evidence regarding contract negotiations and subsequent communications and conduct of the parties relating to the contract. In fact, the plaintiffs do not assert that they were prevented from introducing any extrinsic evidence, or that some specific relevant evidence exists and was proffered, but was foreclosed by a ruling of the court. Thus, we have the extrinsic facts before us. From our examination it is apparent that, unlike JER, the evidence is far from overwhelming or crystal clear in favor of the plaintiffs' position that the parties intended regulated rates to survive deregulation.

Indeed, plaintiffs point us to nothing in the record which directly addresses the parties' intentions regarding the effect of deregulation on contract prices set by reference to the area rate clause. One internal communication in 1976 from Woods to Moncrief stated that MDU was offering an attractive base price and a good opportunity for price increases in the future. 8 J.A. 3516-18. Another, commenting on the draft contract, stated that "there are numerous price protection clauses that will permit us to be on a par with the highest price paid in the Powder

River Basin by any bona fide purchaser. At the present time, the $1.00 per MMBtu price is the highest in Wyoming." 8 J.A. 3525.

Moreover, Claud Pickard, MDU's gas-supply manager, testified at his deposition as follows:

> Q. [Pl. Exh. 8] says there are numerous price protection clauses that will permit us to be par with the highest price paid in the Powder River Basin by any bona fide purchaser. Would you agree that that was an accurate statement of the contract?
>
> A. I would think so, uh-huh.
>
> . . . .
>
> Q. Was that the intent of the parties when they entered into the contract back in '76?
>
> A. <u>Well, I don't think it was the intent of MDU to be the highest priced</u>, but when you put a <u>favored nations clause</u> in the contract, that's the way it works.

5 J.A. 2397-98 (portions of Pickard's deposition introduced at trial) (emphasis added). Pickard also testified, at trial, that the main purpose of intrastate contracts was to obtain higher prices <u>under favored nations clauses</u>, and that higher prices under the area rate clause <u>or the favored nations clause</u> would supersede the base price. 5 J.A. 2373-74, 2396.

Apparently this testimony underlies the district court's finding of fact that "Moncrief and Woods believed that the price could not decrease from the highest rate achieved at any time during the contract." 3 J.A. 1175. But, as the Pickard

-35-

testimony quoted above indicates, it was     not the intent of MDU to be the highest priced.  Pickard then went on to state, nevertheless, that the      favored nations clause works that way.

None of this evidence, or any other, directly addresses what the parties intended to happen to regulated prices upon deregulation.  Such evidence as there is refers consistently to prices paid to bona fide purchasers, a term used in the favored nations clause.  This supports the defendants', not the plaintiffs', view.

Neither Tex Moncrief nor Claud Pickard, the only witnesses at trial involved in negotiating the contract, had any recollection of the parties' intent or discussions regarding the operation of the pricing clauses following deregulation. 5 J.A. 2260-62, 2267-70, 2298-2306, 2409-10.  Moncrief did not testify that the price set under the area rate clause could not decrease after deregulation.  5 J.A. 2396.  Thus, to reiterate the point, the evidence regarding the parties' intent at the time of drafting, unlike the evidence in     JER, is hardly overwhelming or crystal clear regarding prices on deregulation.

The parties' course of conduct, however, cuts directly against plaintiffs' argument.  The defendants paid amounts equal to the highest applicable regulated rates until the end of 1984 when they considered such prices to have been deregulated by Congress.  At the time the regulated price was $3.845 per MMBtu. The defendants then notified the Moncriefs that the price would drop to $2.25.

The Moncriefs refused to sign any contract amendment to that effect, but stated they would not sue, and they accepted, without protest, payments based on the $2.25 rate in 1985 and 1986. After a similar notification, the defendants dropped the price to $1.75 per MMBtu, which the Moncriefs accepted, without protest, from 1987 to 1993.

Not once during this time did the Moncriefs claim that the higher price paid in 1984 was required under the contract to continue. Nor did Woods or the other working interest owners who had contracts identical to the Moncrief contract claim that 1984 regulated prices must continue. See 6 J.A. 2966.

In sum, as the district court found, the Moncriefs knowingly received prices lower than the 1984 regulated price for more than eight-and-a-half years, and collected approximately $1,244,000 at those rates,[11] without once voicing the highest price/benchmark interpretation of the contract they now urge. Their explanation is that Moncrief was simply waiving contract rights month by month, Appellants' Reply Br. at 41, 49, or that the defendants "laid low" knowing, apparently, that Moncrief was making a mistake, id. at 48. These arguments do not square with the fact that the Moncriefs were and are experienced professionals in the oil and gas business.[12] When parties on both sides of a

---

[11]See Plaintiffs' Second Amended Complaint, 1 J.A. 350, at ¶¶ 16-24.

[12]Over the years, the Moncriefs have exhibited aggressive attention to their
(continued...)

-37-

contract are knowledgeable, experienced professionals, their course of dealing under the contract is more likely to show their intent as to the operation of the contract than to suggest mistake or ignorance. That is especially true here where the plaintiffs do not seriously advance the latter position, there is no evidence to support it, and the district court made express findings to the contrary. Thus, eight and one-half years of payments, knowingly received, essentially defeats the plaintiffs' argument.

It is true that the plaintiffs do point to some contrary evidence in the way of defendants' filings with the FERC in 1987, in which higher applicable rates are mentioned. 9 J.A. 3851, 3863. Even crediting this evidence, however, it is impossible to conclude that the district court erred by rejecting the plaintiffs' argument that the contract price could never decrease. Even if we assume, arguendo, that the contract was ambiguous on this point, the extrinsic evidence contained in the record, especially the parties course of performance over eight-

---

[12](...continued)
oil and gas contracts and leases, suing to enforce rights under such contracts or leases at least eight times, including this litigation. See Moncrief v. Martin Oil Serv., Inc., 658 F.2d 768 (10th Cir. 1981); Moncrief v. Pasotex Petroleum Co., 280 F.2d 235 (10th Cir. 1960); Moncrief v. St. Regis Corp., No. TCA 85-7023-WS, 1985 WL 17480 (N.D. Fla. Aug. 13, 1985); Moncrief v. Louisiana Land and Exploration Co., 861 P.2d 516 (Wyo. 1993); Moncrief v. Sohio Petroleum Co., 775 P.2d 1021 (Wyo. 1989); Andrau v. Michigan Wisconsin Pipe Line Co., 712 P.2d 372 (Wyo. 1986); 6 J.A. 2442 (testimony of Moncrief employee Kenneth Wilkes, who stated that he could recall at least one other occasion, involving "El Paso Natural Gas," in which the Moncriefs initiated litigation to enforce their contract rights).

and-one-half years, is too much against the plaintiffs to support a remand to the district court for fact findings based on parol evidence.

**3.**

For the reasons stated above, we hold that, however viewed, the district court did not err in its conclusion that regulated rates did not continue to set prices under this contract after those rates were terminated by Congress. Accordingly, it is unnecessary to address whether deregulation, as it pertains to this contract, occurred on January 1, 1985, or on January 1, 1993. The only question we must address here concerns the proper price to be paid for the contract gas from August 1993 to July 6, 1996.

**C.    What Price Applies?**

Our disposition of the issues above leads us back to the district court's conclusion at the end of its summary judgment opinion—that the contract price after August 1993 should be set by reference to a fair value price. Paragraph 7.4 of the contract does not apply. Paragraph 7.6 was expressly abandoned as a claim. Paragraphs 7.1 and 7.2 have been set aside by the parties' course of conduct just as surely as the plaintiffs' argument regarding the survival of regulated rates was set aside by the same course of conduct. Thus, despite the

district court's finding that the plaintiffs' letters in 1993 did not amount to a request for price redetermination under ¶ 7.5, [13] the posture of the case places the parties constructively in that position, or simply at "a reasonable price" according to the open price provision of the Uniform Commercial Code. See Wyo. Stat. Ann. § 34.1-2-305; see also Koch Hydrocarbon v. MDU Resources Group, Inc., 988 F.2d 1529, 1535 (8th Cir. 1993) (stating that if the contract was ambiguous as to the parties' intent regarding price after deregulation, the contract price after deregulation should be set by applying § 2-305 of the Uniform Commercial Code).

In the district court's summary judgment opinion, it reserved the question of damages for trial. At trial both parties presented alternative theories of damages that included expert testimony on fair value price and market price. [14] We therefore vacate the damage award, and remand the case to the district court

---

[13] By submitting this case to judicial resolution, the parties have waived any claim to arbitration under ¶ 7.5.

[14] Plaintiffs' expert witness, B. Pete Huddleston, testified that the fair value price for the parties' contract gas after August 1993 was $2.01 per MMBtu. 6 J.A. 2709. Defendants' expert witness, Dennis Haider, testified that the fixed fair value price was $1.835 per MMBtu, 7 J.A. 3292, but that the parties may have also used the "monthly price on the CIG index as adjusted," 7 J.A. 3274, which would have resulted in monthly fluctuations in the price as reflected in expert witness R. Dean Graves' damages exhibits, 11 J.A. 4626. On remand, it will be the task of the district court to choose from among these numbers, keeping in mind that the pipeline, through its course of performance, has forfeited its right to claim any number lower than $1.75 per MMBtu.

to determine damages based on the testimony presented at the first trial.[15] It goes almost without saying that any uncertainty in ascertaining exact amounts caused by the defendants' repudiation must be resolved against them.

## II.    Quantity

We now turn to the issues surrounding the quantity of natural gas defendants were obligated to purchase under the contract. The quantity terms of the parties' contract state that "Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase, receive and pay for the daily quantity of gas which is physically available to Buyer at the delivery point on each day of the term hereof," up to a maximum of 12 million cubic feet per day. 8 J.A. 3536 (¶¶ 3.1, 3.2). The district court held, based on the language of these provisions, that defendants were obligated to purchase as much gas as plaintiffs made available at the delivery point, up to the stated maximum of twelve million cubic feet per day. Defendants assert that the district court's holding erroneously obligates them to purchase two varieties of gas from lands not dedicated to the contract. First, defendants argue that the district court's holding obligates them to purchase gas

---

[15]While the district court must select the applicable contract price from testimony and evidence presented at the first trial, without hearing any additional evidence, it may, once it has selected the contract price, entertain additional witness testimony regarding the calculation of damages using the contract price established by the district court and the quantity of purchase obligations set forth below.

attributable to other areas of the PPMU, not originally part of the Powell II Unit or otherwise dedicated to the contract. Second, defendants contend that the district court's holding erroneously obligates them to purchase natural gas produced on lands outside the entire PPMU and not dedicated to the contract, purchased by plaintiffs, and injected into the PPMU reservoir for conservation purposes. We will address each of these assertions in turn. This portion of the district court's holding was decided as a matter of law, and therefore our review here is de novo.

### A. Are Defendants Obligated to Purchase Only Gas Produced From Lands Dedicated to the Contract?

There are generally two types of natural gas purchase contracts. The first is known as a warranty contract, under which the producer warrants to the purchaser that it will provide a certain amount of natural gas at the times and places specified under the contract. A warranty contract does not specify where the gas is to come from; it simply obligates the producer to come up with the specified amount of gas from any source and deliver it to the purchaser. See 8 Howard R. Williams et al., Oil and Gas Law 1162 (1997) (defining "warranty contract" as "[a] contract for the sale of gas wherein the producer agrees to sell a specific amount of gas and the gas delivered in satisfaction of this obligation may come from fields or sources outside the designated fields"); see also Florida Power &

-42-

Light v. FERC, 598 F.2d 370, 375 (5th Cir. 1979) (describing a warranty contract). The second is known as a dedication contract, wherein the producer "contracts to furnish the purchaser all the gas produced from specified reserves, thus 'dedicating' those reserves to the customer." 8 Howard R. Williams et al., Oil and Gas Law 253 (1997); see also Louisiana Land & Exploration Co. v. Texaco, Inc., 478 So. 2d 926, 927 (La. Ct. App. 1985) (distinguishing a warranty contract from a dedication contract), rev'd on other grounds, 491 So. 2d 363 (La. 1986). By its own unequivocal terms, the parties' contract was a dedication contract. The contract states that it covers certain lands only; these lands are specifically enumerated in Exhibit B to the contract. Paragraph 1.1 of the contract states that "Seller hereby commits to the performance of its obligations under this Agreement, all of Seller's interest in gas produced from wells completed on the lands as previously set forth herein, and dedicated to this contract . . . ." 8 J.A. 3535 (¶ 1.1) (emphasis added).

This conclusion is supported by an examination of the parties' course of dealing. See Wyo. Stat. Ann. § 34.1-2-202, comment 1(c) (Michie 1997) (allowing courts to examine the parties' course of dealing even where the contract is unambiguous). When the contract was first signed in 1976, the lands dedicated to the contract included only plaintiffs' interest in the Powell II Unit, as well as two other small parcels. On two occasions, in 1977 and 1978, the parties

-43-

amended the contract to include other parcels. See R. Vol. 12, Supp. App., Tab 303. In 1979, the parties again amended the contract, this time to remove lands from the contract's purview. Id. at Tab 304. If the contract were something other than a dedication contract, such amendments would have been wholly unnecessary. Under warranty contracts, it is irrelevant where the gas comes from, as long as the producer delivers it to the specified place on time. Dedication contracts, however, are intended to cover only gas produced from the specified parcels. Plaintiffs took great care in the early years of the contract to amend the contract to include additional production wells. This course of performance indicates that the parties understood the contract to be a dedication contract which applied only to gas produced from the lands dedicated thereunder. [16]

When the PPMU was created in 1983, it consisted of the Powell II Unit and several other parcels previously dedicated to the contract, as well as some lands

---

[16]In his opening argument at the first trial, counsel for the Moncriefs, in describing Exhibit P-38, stated as follows:

> In Exhibit 38, [MDU] asks Moncrief to dedicate additional acreage to it at the Powell II Unit. In all there are four amendments to the contract which we believe add acreage. There's controversy about one of them, whether it adds or deletes acreage, but each of these amendments . . . will bring more and more lands both in the Powell Unit and outside the Powell Unit under the commitment to the contract, which of course means that Moncrief can't sell the gas from these lands to other people.

5 J.A. 1943-44 (emphasis added).

not previously dedicated to the contract. R. Vol. 12, Supp. App., Tab 299. Plaintiffs argue that the establishment of the PPMU was an "expansion" of the Powell II Unit, as provided for in Exhibit B of the contract. Appellants' Reply Br. at 4-6; 8 J.A. 3556 (stating that the contract covers plaintiffs' interest in the Powell II Unit "as said Unit is approved by the United States Geological Survey and as such Unit is expanded or contracted from time-to-time by the U.S.G.S."). We are not persuaded. The creation of the PPMU was a unitization of several parcels, not an expansion of the Powell II Unit. By creating the PPMU, the Bureau of Land Management (BLM) terminated both the Powell II Unit and the adjacent Spearhead Ranch Unit, owned by producers other than plaintiffs, and combined them into one unit for conservation purposes. Essentially, the BLM unitized all units in the same reservoir, including the former Powell II Unit, the former Spearhead Ranch Unit, and others, into one new unit, called the PPMU. This was not an expansion of the Powell II Unit as encompassed by the language in Exhibit B. The record demonstrates that even plaintiffs considered the action a "[u]nitization" rather than an expansion. 8 J.A. 3741 (a letter from Woods to all working interest owners in the Powell II Unit, and referring to the BLM action as "unitization").

Indeed, the unitization brought about by the creation of the PPMU is covered by another provision of the contract. In Article III (A) of the contract,

plaintiffs retain certain rights, including the right to "unitize or pool any of Seller's lands committed hereunder with other properties of Seller or others in the same field . . . ." 8 J.A. 3546 (¶ 3.1(e)) (emphasis added). In that event, the "Agreement will cover Seller's production attributed to the said lands in the unit or units so formed." Id. (emphasis added). Thus, under the unambiguous terms of the parties' contract, a unitization such as that effected by the creation of the PPMU does not incorporate the other lands within the unit into the contract's coverage. Rather, the contract provides that in the event of unitization, the contract will cover only that portion of Seller's production attributed to the contract lands within the new unit.

We conclude, therefore, that only the specific lands enumerated in Exhibit B to the contract, and not the entire PPMU, were dedicated to the contract. Under the unambiguous terms of the parties' dedication contract, most notably ¶ 3.1(e) of Article III (A), plaintiffs were obligated to sell, and defendants obligated to purchase, only that portion of plaintiffs' natural gas production attributable to the previously-dedicated contract lands. To the extent the district court's holding is inconsistent with this conclusion, it is reversed.

**B.    Are Defendants Obligated to Purchase Injected Gas?**

Next, we must determine whether defendants are obligated to purchase the 17.5 billion cubic feet of gas purchased from sources outside the lands dedicated to the contract, and subsequently injected into the PPMU reservoir to maintain pressure. This issue has had a complicated journey through the district court. Both parties moved for summary judgment on the issue, with plaintiffs arguing that the pipeline had to purchase the non-native injected gas, and defendants asserting that such gas was not covered by the contract. 1 J.A. 62-64, 109-11. In its summary judgment opinion, the district court ruled in plaintiffs' favor on the issue, relying on ¶ 3.1 of the parties' contract, and stated that "the Plaintiffs' Motion for Summary Judgment on the issue of make-up gas be, and the same hereby is, GRANTED and the Defendants' Motion for Summary Judgment on the same issue be, and the same hereby is, DENIED."      Moncrief, 880 F. Supp. at 1523, 1524. However, during the ensuing bench trial, the district court and both parties appeared to treat the issue as one which had not yet been decided. The district court allowed both parties to argue essentially the same positions that had already been decided at the summary judgment stage, and to introduce both documentary evidence and witness testimony on these issues.      [17]  In its post-trial

_____

[17]For instance, plaintiffs' counsel, during opening argument, stated that "there's another argument in this case about whether or not this gas which comes from outside sources, is injected into the reservoir, should be included under the contract," 5 J.A. 1945, and that there was "a question about whether or not the right of first refusal [granted to Mountain Fuel] destroys the dedication of this

(continued...)

-48-

opinion, the district court spent only one sentence on injected gas issues, essentially restating its summary judgment conclusions, and stating that "the language [of the contract] is unconditional, and requires WBIPC to purchase injected or makeup gas." 3 J.A. 1198.

---

[17](...continued)
[injected] gas to the contract," 5 J.A. 1948. Plaintiffs' counsel also introduced exhibits relating to plaintiffs' argument that the pipeline's concerns about nitrogen injection somehow estopped them from arguing that they were not obligated to purchase non-native injected gas, 5 J.A. 1976-77, and introduced exhibits relating to the Mountain Fuel right-of-first-refusal argument, 5 J.A. 1980-87. Plaintiffs' counsel even went so far as to state that "[w]e're trying to put in all the evidence relating to all the issues in the case even though there's been a prior ruling." 6 J.A. 2558.

Defendants' counsel made similar arguments, stating that "[o]ne of the other issues in this dispute is whether WBI[PC] is obligated to purchase makeup gas . . . ," 6 J.A. 2881, asserting that the pipeline was not obligated to purchase non-native injected gas, and introducing exhibits relating to both the estoppel and right-of-first-refusal arguments, 5 J.A. 2090-91, 2100-04, 2107-08.

In addition, both parties quizzed witnesses about repressurization programs generally and the PPMU program specifically. For instance, plaintiffs' counsel asked Tex Moncrief about his reasons for wanting to include ¶ 3.1(b) of Article III (A) in the contract, 5. J.A. 2200-01, and asked Claud Pickard whether MDU intended "to purchase anything other than what you would have estimated as the native gas" in the reservoir, 5 J.A. 2416. Plaintiffs also called Dr. Holditch to testify about the amounts and percentages of non-native gas injected into the reservoir. 5 J.A. 2340-44. For their part, defendants called a professor of their own, Patrick Martin, who offered his expert opinion that "there is no obligation under the contract to purchase the gas that is attributable to outside purchases," including injected gas. 6 J.A. 3026, 3027.

Thus, we are faced with an issue which was decided on summary judgment as a matter of unambiguous contractual interpretation, yet about which the district court took all manner of extrinsic evidence at trial.

**1.**

Our first task is to determine whether the district court correctly concluded that the contract was clear and unambiguous with respect to the non-native injected gas issue. The district court, relying on ¶ 3.1's "physically available . . . at the delivery point" language, held as follows:

> Defendant is required to purchase the minimum daily amount available at the delivery point. There is no exception for injected or make-up gas. The Count [sic] finds that this language is unambiguous and that it requires the defendants to purchase, subject to the contractual quantity limitations, the minimum amount of gas offered at the delivery point, regardless of whether the gas is make-up gas or not.

Moncrief, 880 F. Supp. at 1523 (footnote omitted). The district court reasoned that because there was no provision excepting makeup gas from the contract, and because the parties were experienced natural gas professionals who could have expressly excepted injected gas from the contract's purview had they so intended, non-native injected gas was covered by the parties' contract.

We see two problems in the district court's analysis of this issue. First, the contract is silent on the entire issue of non-native injected gas, and certainly does

-50-

not specify whether such gas is dedicated to the contract or not. The only contractual provision that even mentions the possibility of injected gas, ¶ 3.1(b) of Article III (A), demonstrates that the parties at least contemplated that the Moncriefs might, at some point, be required to use some of the gas produced on the dedicated lands for reinjection purposes. However, this provision states only that the plaintiffs would not be required to sell native gas necessary for pressure maintenance to defendants. Notably, while this provision explicitly addresses reinjection of native gas, it is wholly silent regarding the issue of non-native injected gas. The silence of ¶ 3.1(b) on the subject of outside makeup gas could be evidence that the parties to the contract, contrary to the district court's conclusion, did not necessarily contemplate the possibility, at the time of drafting, that non-native gas may be needed to maintain pressure in the reservoir.

A contract's silence on a particular issue does not create an ambiguity in every instance, but silence on a "matter naturally within the scope of the contract" gives rise to ambiguity. Cheyenne Mountain Sch. Dist. v. Thompson, 861 P.2d 711, 715 (Colo. 1993). [18] Questions regarding which gas is dedicated to the contract and regarding the pipeline's obligation to purchase gas are issues

---

[18]Wyoming courts have not spoken on the issue of whether a contract's silence creates an ambiguity. We cite Colorado courts' thinking on the issue because the Wyoming state courts may find the position of their sister state persuasive. See, e.g., State ex rel. Bayou Liquors, Inc. v. City of Casper, 906 P.2d 1046, 1050 (Wyo. 1995) (looking to Colorado case law for guidance on an issue not yet considered by Wyoming courts).

naturally within the scope of the contract, and we therefore conclude that the contract is ambiguous on this issue.

Second, the district court's analysis on the issue of ambiguity is additionally flawed, because it overlooked the fact, discussed above, that the parties' contract is a dedication contract, which covers only gas attributable to lands expressly dedicated to the contract. 3 J.A. 1198 (statement of the district court, in its post-trial conclusions of law, that "[t]he contract says nothing about limiting WBIPC's take to a dedication of reserves"). Gas produced from lands not dedicated to the contract is not covered by the contract. Contrary to the holding of the district court, the defendants are not obligated to purchase all gas physically available at the delivery point unless the gas was produced from dedicated lands.

Indeed, the district court's analysis could lead to absurd results. If the parties' contract really did obligate the pipeline to purchase all gas physically available at the delivery point, regardless of origin, the contract would become little more than an arbitrage contract, under which plaintiffs, when the market price of gas fell, would be able to purchase gas from outside sources, transport it to the delivery point, and demand that defendants purchase it at the applicable contract price. Construing this dedication contract in its entirety, we find it unlikely that the parties intended such a result, and we therefore conclude that, in

any event, the contract does not unambiguously point to the district court's interpretation of the contract's quantity provisions.

**2.**

In most such cases, where we conclude that the district court erred in deciding that a contract is unambiguous, and we reverse a grant of summary judgment entered as a matter of unambiguous contractual interpretation, we must remand to the district court for findings regarding the interpretation of the ambiguous contract.    See Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program 1981   , 836 F.2d 462, 466 (10th Cir. 1987);     see also  Moriarty v. Svec, 164 F.3d 323, 330-32 (7th Cir. 1998).  We need not do so, however, where all the extrinsic evidence is in, and where that evidence so clearly weighs in one direction that there is no genuine issue of material fact left for the district court to decide.   See Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc. , 989 F.2d 132, 137 (3d Cir. 1993) (reversing a grant of summary judgment in favor of the union based on a finding that the agreement was unambiguous, holding that the contract was actually ambiguous, but refusing to remand for findings because "[a] rational fact-finder could not conclude otherwise" than to enter summary judgment for the corporation, and directing the district court to enter summary judgment for the corporation);     cf. Fry v. Airline

Pilots Ass'n, Int'l, 88 F.3d 831, 843 (10th Cir. 1996) (directing entry of summary judgment because "it would be a pointless exercise to remand the case for further consideration on the issue since the outcome is clear").

Because of the unusual procedural posture of this issue—an issue decided on summary judgment, yet about which the parties introduced evidence and testimony at trial—we have before us all of the arguments and evidence relevant to this issue. The evidence, in addition to the contractual provisions mentioned above, cited to us and to the district court on this issue is as follows:

a. <u>Negotiation History</u>. The only persons involved in the negotiation of the parties' contract who testified at trial were Tex Moncrief and Claud Pickard. Both witnesses were asked about the injected gas issues. When asked whether it was MDU's intent "to purchase anything other than what you would have estimated as the native gas under those reserves," Pickard stated, "[n]ot at that time, no." 5 J.A. 2416. Tex Moncrief was asked about his reasons for wanting to include ¶ 3.1(b) of Article III (A), and stated that plaintiffs anticipated quite early on that they might have to begin a pressure maintenance program in the Powell II area. 5 J.A. 2200-01. He was, however, not asked anything about the pipeline's obligation to purchase non-native injected gas, and his testimony shed no light on the issue.

Notwithstanding the inconclusive nature of Tex Moncrief's testimony on this point, and the clear testimony of Pickard that the pipeline did not, at the time of drafting, intend to purchase non-native gas, plaintiffs argue that we should infer an intention on the part of the pipeline to purchase all gas, including non-native injected gas, from the following evidence: (1) the prevailing market conditions at the time the contract was signed, and (2) the fact that this was a "deliverability" contract under which the pipeline agreed to purchase all gas delivered to the delivery point. Appellants' Reply Br. at 4, 7. However, we will not draw such an inference from general market evidence when there is specific testimony, from Pickard, that notwithstanding market conditions, MDU did not intend to purchase anything other than native gas. And plaintiffs' argument about the "deliverability" contract overlooks the fact, discussed above, that this was a dedication contract, and that the pipeline agreed to purchase all gas plaintiff tendered at the delivery point, up to a 12 million cubic feet per day ceiling, but only if that gas was produced from lands dedicated to the contract.

When we examine the negotiation history as a whole, then, the evidence regarding the parties' intentions at the time of drafting weighs in favor of the pipeline.

b. <u>Actions Since Negotiation</u>. The parties point us to at least two basic post-negotiation events which they assert shed light on this issue. We discuss

each in turn. First, the defendants direct us to two contracts plaintiffs signed with Mountain Fuel Supply Company. Under the terms of these contracts, plaintiffs contracted to purchase outside natural gas for injection into the PPMU reservoir. Both of these contracts had a significant provision granting Mountain Fuel an option, known as a "right of first refusal," to buy back the injected gas at the commencement of blowdown operations. 10 J.A. 4374, 4427 (stating that "Seller shall have first option to purchase part or all of the available volumes"). As discussed above, however, the parties' contract is a dedication contract, under which plaintiffs were obligated to sell, and defendants obligated to purchase, gas produced from lands dedicated to the contract. If plaintiffs had intended that the gas purchased elsewhere and injected into the reservoir was to become dedicated to the parties' contract, they would not, and indeed could not, have granted Mountain Fuel a right of first refusal. All gas covered by the contract is dedicated  for sale to defendants, and plaintiffs may not sell such gas to other purchasers. Plaintiffs are obligated to sell dedicated gas to defendants, and defendants are obligated to purchase such gas. The only possible inference a rational fact-finder can draw from plaintiffs' willingness to grant Mountain Fuel a right of first refusal is that the parties never intended the injected gas to become dedicated to the contract. [19]

---

[19]The fact that Mountain Fuel eventually decided not to exercise its rights
(continued...)

The record also demonstrates that defendants shared this understanding. The government requires interstate pipeline companies, such as defendants, to annually submit documents detailing the reserves of gas they currently have under contract. The record reflects that at no time did defendants' governmental filings contain any reference to PPMU injected gas. 6 J.A. 2973-74. This suggests that defendants claimed no contractual right or obligation to purchase the injected gas.

Second, plaintiffs point us to evidence in the record that MDU "urged the [plaintiffs] to use natural gas" instead of nitrogen for pressure maintenance purposes, and argue that, therefore, the pipeline "may not now claim [that it] does not have to buy the gas it urged the [plaintiffs] to inject." Appellants' Reply Br. at 7. However, the record evidence plaintiffs point to in support of this estoppel-based argument simply does not advance their cause. The record reflects that the decision to use natural gas rather than nitrogen was made by plaintiffs for the sole benefit of plaintiffs. It was an economic decision entered into after careful consideration of the costs and benefits of nitrogen injection. It was the plaintiffs, not the defendants, who would have been stuck with the costs of nitrogen

[19](...continued)
of first refusal on the non-native injected gas is wholly irrelevant. By granting the right of first refusal in the first place, plaintiffs demonstrated that they did not intend to dedicate the injected gas to the contract. Mountain Fuel's later unilateral decision to decline to exercise its rights cannot transform the gas from non-dedicated to dedicated, absent some sort of agreement to that effect between plaintiffs and WBIPC.

rejection upon blowdown, and the plaintiffs made an independent economic decision to use natural gas.   See 8 J.A. 3739 (internal pipeline memorandum stating that plaintiffs told the pipeline that, if the plaintiffs decided to use nitrogen, "Woods would install a nitrogen rejection plant" and "would balance the cost of installing that plant and the cost of the nitrogen against the natural gas cost and make a decision");   see also 5 J.A. 2337-39 (testimony of Dr. Holditch that plaintiffs obtained a "20 percent rate of return" on the injection investment using natural gas).

Plaintiffs' estoppel-based argument is also somewhat illogical.  Had plaintiffs elected to use nitrogen instead of non-native natural gas for pressure maintenance purposes, it would be untenable for them now to argue that the contract somehow obligated the pipeline to purchase the nitrogen upon blowdown. Whether nitrogen, non-native gas, or some other substance, the plaintiffs were merely using the substance as a tool to maximize native oil and gas extraction. Plaintiffs' argument that the pipeline is obligated to purchase plaintiffs' tools, employed solely for plaintiffs' economic benefit, is simply unavailing.

When examined in its entirety, the evidence concerning the parties' actions since the contract was signed weighs heavily in favor of the defendants' interpretation of the contract.  Indeed, the evidence is so one-sided on this point that we consider it a fruitless exercise to remand to the district court for the entry

of findings on this issue. There simply is not a genuine issue of material fact here for the district court to decide. Starting with the premise that the parties' contract is a dedication contract, and taking into account all relevant extrinsic evidence, there is no destination at which a rational fact-finder can arrive other than at the conclusion that the contract does not obligate defendants to purchase non-native injected gas. This litigation has lasted six years already, and in the interest of judicial economy, we direct the district court to enter summary judgment for the pipeline on the injected gas issue.

### 3.

We are then faced with the issue of determining plaintiffs' damages, if any. It is undisputed that defendants are obligated to purchase native gas extracted from lands dedicated to the contract, even if that gas was subsequently injected back into the reservoir from whence it came. We hold above that defendants are not obligated to purchase non-native gas, extracted from lands not dedicated to the contract, and subsequently injected into the PPMU reservoir. The problem we face is that once injected into the reservoir, the two types of gas become fungible, and it is impossible to tell the difference between native and non-native gas.

We are aware that it is common practice in the oil and gas industry, at least for royalty and taxation purposes, to treat the first gas extracted from the reservoir

upon blowdown as the non-native injected gas. For instance, in this case, the PPMU owners agreed that no royalty payments would be made on the first 17.5 billion cubic feet of gas extracted from the reservoir upon blowdown, R. Vol. 12, Supp. App., Tab 308 at 20, and that the Wyoming Oil and Gas Conservation Commission exempted the first 17.5 billion cubic feet from state taxation, 10 J.A. 4580.

However, these are only administrative determinations driven by convenience, and we need not give undue deference to them. In the gas purchase context, as opposed to the royalty or taxation contexts, we think such administrative determinations have limited applicability, especially where, as here, the contract term has expired and all we must do is calculate damages. Convenient administrative fictions do not alter the fact that defendants are obligated to purchase all native gas produced from lands dedicated to the contract. Were we to apply the same methodology used by the Wyoming Oil and Gas Conservation Commission, defendants would be relieved of their obligation to purchase a portion of the native gas. This is so for two reasons. First, it is undisputed that a significant fraction of the gas contained in the PPMU reservoir will be economically unextractable, and if we were to treat the first 17.5 billion cubic feet of blowdown gas as makeup gas, we would be ignoring the reality that not all 17.5 billion cubic feet of injected gas is going to be withdrawn from the

reservoir, and that some of that designated 17.5 billion cubic feet is actually native gas which defendants are obligated to purchase. Second, if we were to treat the first 17.5 billion cubic feet of gas as non-native injected gas, defendants' obligation to purchase gas would not be triggered until sometime in April 1995, [20] leaving only 15 months until the expiration of the contract.

A more equitable way to apportion damages under the facts of this case is to require defendants to purchase the aliquot portion of the daily gas extraction attributable to the lands dedicated to the contract proportionate to the ratio of native to non-native gas in the reservoir at the commencement of blowdown. [21] That is, if 20 percent of the gas in the reservoir at the beginning of blowdown was determined to be non-native injected gas, then WBIPC is obligated to purchase 80 percent of each day's gas output attributable to dedicated lands, beginning on the date blowdown operations commenced, and terminating on July 6, 1996.

---

[20]This date was calculated by looking to Dr. Holditch's testimony that it would take approximately 500 days from the beginning of blowdown—approximately December 1, 1993—to withdraw 17.5 billion cubic feet of gas. 5. J.A. 2346.

[21]Perhaps a helpful way to look at the problem is to suppose that plaintiffs had elected to inject nitrogen rather than non-native gas. In that event, the pipeline would have been obligated to purchase all native gas _after_ the nitrogen had been separated. The actual situation here is similar, in that we must, when calculating plaintiffs' damages, hypothetically separate the non-native gas from the native gas.

The only testimony in the record on this point of which we are aware is the testimony of Dr. Holditch, and even his testimony is somewhat inconclusive. He stated that at the start of blowdown, "there was 82 billion cubic feet of total gas in the reservoir," and "[a]pproximately 17 billion of that would have been the purchased gas, the make-up gas, and the difference would be native gas." 5 J.A. 2340. Using these figures, 21.3% of the gas in the reservoir is non-native injected gas. However, later in his testimony, Dr. Holditch stated that approximately 20 percent of the gas in the reservoir is non-native. 5 J.A. 2345. As far as we are able to tell, defendants did not tender a witness who testified as to the percentages of gas in the reservoir. Thus, we must remand to the district court for a determination regarding the percentage of non-native gas in the reservoir at the start of blowdown.

Accordingly, to the extent that the district court's conclusions are inconsistent with our holding that the defendants are not obligated to purchase non-native injected gas, they are reversed, and we remand to the district court for entry of summary judgment in favor of the pipeline on the injected gas issue, and for a determination of the exact percentage of non-native injected gas recoverable from the reservoir.

## III.    Prejudgment Interest

The final issue which we must address is plaintiffs' contention that the district court erred in refusing to grant prejudgment interest on plaintiffs' damages award. Under Wyoming law, which governs this inquiry, see Wyoming Constr. Co. v. Western Cas. & Sur. Co., 275 F.2d 97, 105 (10th Cir. 1960), "prejudgment interest is recoverable . . . on liquidated claims but not on unliquidated claims, with a liquidated claim being defined as one that is readily computable by basic mathematical calculation," Dunn v. Rescon Tech. Corp., 884 P.2d 965, 968 (Wyo. 1994). The district court held that the claim was unliquidated, because of the difficulty involved in arriving at the amount of damages awarded. 4 J.A. 1486 (stating that "the Court's multifaceted inquiry demonstrates the difficulty with which the Court reached the amount due and confirms that the amount due was unliquidated"). Clearly, the district court based its conclusion that prejudgment interest was not warranted on its determination that the contract price from August 1993 to July 1996 was governed by the favored nations clause. As discussed above, we hold that the district court incorrectly reached the merits of the favored nations issue, and we hold that the contract price for the relevant time period should be set by reference to a fair value price for the natural gas covered by the contract.

-63-

Our reversal of the district court's decision regarding the applicability of the favored nations clause changes the calculus of the prejudgment interest issue. In Wyoming, "[l]iquidated claims [are] those which are certain by computation from the face of the contract, or which might be made certain by reference to well-established market values plus computation." Chandler-Simpson, Inc. v. Gorrell, 464 P.2d 849, 853 (Wyo. 1970) (internal emphasis omitted and emphasis added). In this case, the quantity of natural gas defendants were required to purchase is a matter of "mathematical calculation." Dunn, 884 P.2d at 968. The applicable price of that gas, however, is not necessarily so simply computed. If the price were set by the favored nations clause, which involves a complicated inquiry indexed to other complex contracts, the claim would almost certainly be unliquidated, as the district court held. However, as noted above, Wyoming courts clearly hold that a claim computable by reference to well-established market values is a liquidated claim. We think the determination regarding whether the fair value price of natural gas under the parties' contract is computed by reference to well-established market prices is a determination best made by the district court in the first instance. This inquiry will necessarily involve questions of witness credibility, which district courts are best equipped to handle. See Johnson v. Hanover Fire Ins. Co., 137 P.2d 615, 619-21 (Wyo. 1943) (citing Kuhn v. McKay, 51 P. 205, 206 (Wyo. 1897), and stating that where credible witness

-64-

testimony is in conflict regarding the amount of damages, the claim cannot be considered liquidated, but where the credible evidence as to amount or market values is "all to one effect," the claim is liquidated).  If the witness testimony regarding fair value price is not really in conflict, or only differs by an insignificant amount, or if one party's witnesses are much more credible than the other's, the amount should be considered liquidated and prejudgment interest should be awarded.  [22]

Therefore, we vacate the district court's determination that prejudgment interest is not warranted in this case, and remand the case to the district court for a determination of whether the fair value price of natural gas applicable to the parties' contract can be "made certain by reference to well-established market values plus computation."   Chandler-Simpson  , 464 P.2d at 853.

**CONCLUSION**

---

[22]Because we require, as discussed above, that the district court set a fair value price based on testimony given at the first trial, without hearing additional testimony on the issue, we do not anticipate that the related prejudgment interest inquiry will require additional testimony.  When making the determination of the applicable price, the district court should consider whether that price is computable by reference to well-established market values and whether the credible witness testimony at the first trial on that point was in conflict, and determine based on its evaluation of that testimony whether the claim is liquidated.

Accordingly, we AFFIRM the district court's conclusions in part, REVERSE in part, and REMAND for further proceedings, consistent with this opinion, to determine the exact amount of damages due plaintiffs.